Robert X. Steele
2100 Lenwood Ave
North Las Vegas, NV 89030
Telephone: (702) 416-4239
Email: SuperGPatriot@tutamail.com
Plaintiff, in Proper Person

FILED ENTERED RECEIVED SERVED ON
COUNSEL/PARTIES OF RECORD
SEP 23 2026
CLERK US DISTRICT COURT
DISTRICT OF NEVADA
BY: DEPUTY

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

ROBERT X. STEELE,
Plaintiff,
v.
CITY OF LAS VEGAS, a political subdivision of the State of Nevada; OFFICER RODRIGUEZ, in his individual capacity; OFFICER COOK, in his individual capacity; SERGEANT COOK, in his individual capacity; and JOHN DOES 1 through 100, in their individual capacities,
Defendants.

Case No. 2:26-cv-03056-APG-EJY

COMPLAINT FOR DAMAGES UNDER 42 U.S.C. § 1983 AND NEVADA LAW

JURY TRIAL DEMANDED

## I. NATURE OF THE ACTION

1. This is a civil rights action under 42 U.S.C. § 1983 and Nevada law. Robert X. Steele was arrested on July 18, 2022 on a charge of driving under the influence, was held overnight at the

City of Las Vegas Detention Center, and was released the next morning. Nothing in this action arises from that night. On December 12, 2024 he appeared in the Las Vegas Municipal Court for a revocation hearing, was convicted of reckless driving, a misdemeanor traffic offense, and went into custody at the City of Las Vegas Detention Center that day to serve a ninety-day sentence. He was held there until on or about January 28, 2025. Within his first three days in custody jail staff told him he could not file anything with a court for thirty days, and from December 14, 2024 they refused his written requests for the forms to appeal. The time to file a notice of appeal was ten days. On his third day he was moved to solitary confinement, where he remained for the rest of his custody, approximately forty-five days, and where staff first set about breaking the hunger strike he had begun the morning of his sentencing; the stated occasion was a slap on a table, and the Plaintiff can only assume that was the excuse and the hunger strike was the reason. The next punitive act came on or about December 16 or 17, 2024, when an officer returning him from the hospital threatened him with suicide watch because he did not like his attitude, and the jail put him on it that night. He was placed on suicide watch three times: the first time for fifteen days, on a bare floor, in a cold cell with the lights on around the clock, with no shower, and a suicide gown too small for him with fastenings so worn it would not stay on, so that he was naked for the whole of it; the second on or about January 20, 2025; and the third just before his release, as punishment. On or about January 20 or 21, 2025, as he was being moved from the day room to his cell to be placed on suicide watch a second time, and while he knelt in the corner of the cell held by four officers, a corrections officer drove his head into the concrete wall with his full body weight behind it, injuring his head and his right shoulder. He asked for medical attention and was offered an over-the-counter pain reliever and nothing else. He was cut off from the telephone for more than a month. He put the City on written notice that he intended to sue, in a written letter given to management and again on the pink request form, or kite.

2. The Plaintiff seeks compensatory damages against all Defendants, punitive damages against the individual Defendants on the federal counts, and costs. The Plaintiff's declaration

under 28 U.S.C. § 1746 is attached as Exhibit 1 and is incorporated into this Complaint by reference.

## II. JURISDICTION AND VENUE

3. This Court has jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3). The claims arise under 42 U.S.C. § 1983 and the First, Eighth and Fourteenth Amendments to the United States Constitution.

4. This Court has supplemental jurisdiction over the Nevada claims under 28 U.S.C. § 1367(a). They arise from the same acts and omissions as the federal claims.

5. Venue is proper under 28 U.S.C. § 1391(b). Every Defendant resides in this district and every event complained of occurred in this district.

6. The Plaintiff was released from custody on or about January 28, 2025 and is not a prisoner within the meaning of 28 U.S.C. § 1915(h) or 42 U.S.C. § 1997e(h). The Prison Litigation Reform Act does not apply to this action.

7. The Plaintiff's federal claims require no notice of claim. Under NRS 41.036(3) the filing of a tort claim with the governing body of a political subdivision is not a condition precedent to an action brought under NRS 41.031. Count Seven of this Complaint is pleaded against the City of Las Vegas alone and names no individual Defendant, because NRS 41.039 requires that such a claim be filed before a tort action is brought against an employee or officer of a political subdivision. The Plaintiff has not filed a claim with the City Council and brings no state-law claim against any individual in this Complaint.

## III. PARTIES

8. Plaintiff ROBERT X. STEELE is a natural person residing in North Las Vegas, Clark County, Nevada. He was fifty-nine years old throughout the events described in this Complaint. During those events he was in the custody of the City of Las Vegas Detention Center under inmate number 1991209.

9. Defendant CITY OF LAS VEGAS is a political subdivision of the State of Nevada. Through its Department of Public Safety, Detention Services, it owns, operates, staffs, funds and sets policy for the City of Las Vegas Detention Center, 3300 E. Stewart Avenue, Las Vegas, Nevada, a facility that holds people charged with or convicted of municipal misdemeanors. The City is a person under 42 U.S.C. § 1983 and is sued for its own policies, customs and failures to train. Under NRS 41.031(1) the State of Nevada has waived the City's immunity from liability for the torts of its employees, and under NRS 41.0337 the City is a necessary party to any tort claim arising from their acts within the scope of employment.

10. Defendant OFFICER RODRIGUEZ was at all relevant times a corrections officer employed by the City of Las Vegas and assigned to the City of Las Vegas Detention Center. He is the officer who applied a pain compliance hold to the Plaintiff's right hand and then drove the Plaintiff's head into the concrete wall of his cell on or about January 20 or 21, 2025. He is sued in his individual capacity. His first name and identification number are in the City's employment and shift records and will be substituted by amendment when produced.

11. Defendant OFFICER COOK was at all relevant times a classification officer employed by the City of Las Vegas and assigned to the City of Las Vegas Detention Center. He is a younger white man. He is the officer who took the Plaintiff to complete a sentence-modification form, gave him fifteen minutes to do it without his glasses, and told him

the alternative was to go back to his cell and do nothing. He is sued in his individual capacity. His first name and identification number are in the City's records and will be substituted by amendment.

12. Defendant SERGEANT COOK was at all relevant times a sergeant employed by the City of Las Vegas and assigned to the City of Las Vegas Detention Center, where he was the head of the classification department. He is an older Black man and is not the same person as Defendant OFFICER COOK, who is a younger white man. The two are different men and are not to be read as one. The classification department was the department responsible for obtaining court dates for inmates and for providing inmates with legal paperwork. Defendant OFFICER COOK and the classification officers who received and handled the Plaintiff's written requests for appeal forms, court information and pleading paper worked under him, and he was Officer Cook's superior. The Plaintiff does not allege that Sergeant Cook personally received, read, answered or acted on any request of his. Sergeant Cook was also not the only sergeant involved in the events described in this Complaint. A large number of sergeants, and the Plaintiff believes at least one lieutenant, took part in or watched what is described below. The City's video and shift records will identify them. Sergeant Cook never touched the Plaintiff. He is named in Count Three for the practices of the department he headed, and in Counts One, Two and Four for what he did and failed to do when the Plaintiff was placed on the second suicide watch, and is sued in his individual capacity. He is not the night-shift sergeant who signed for the Plaintiff's letter to jail management; that sergeant is a different person and is named here as a JOHN DOE. The Plaintiff's written request of January 21, 2025 about his missing telephone time was addressed to Sergeant Cook by name and was written in anger. The Plaintiff was ranting at him on that form because he ran the department, not because Sergeant Cook had done anything to him personally. The Plaintiff does not allege that Sergeant Cook took his telephone time, and does not know whether Sergeant Cook ever saw that request. His first name and identification number are in the City's records and will be substituted by amendment.

13. Defendants JOHN DOES 1 through 100 are corrections officers, sergeants, a lieutenant, classification officers, nurses, a doctor and other employees of the City of Las Vegas or of its medical contractor who took part in the acts and omissions described below and whose names are not yet known to the Plaintiff. They include: the classification officer for the Plaintiff's first general-population housing unit, who told him he could not file for thirty days; the sergeant who told him during the first suicide watch that a sentence modification was the only thing he could file; the second-floor classification officer who told him he could file a sentence modification or an appeal but not both and refused him the appeal paperwork; the officers and nurses who conducted the first watch, kept him on it for fifteen days without clinical review, and withheld clothing, bedding, showers and anything to write with; the night nurse who handed the Plaintiff a sick call form through the portal in his cell door on or about December 19, 2024 and would not fill it out for him, a Black woman of about thirty to forty years of age, heavy build, about five feet eight inches tall, who worked the night shift regularly throughout the Plaintiff's custody; the officer escorting that round, a woman with red hair of about fifty-five to sixty-five years of age, holding no rank above officer, who refused him a pen because he was on suicide watch; the officer who, together with Officer Perez, transported him to University Medical Center on or about December 16 or 17, 2024 and who, while pushing him in a wheelchair from the transport van to the housing unit, told him that the jail could always put him on suicide watch; the nurse who checked him back into the jail that night and placed him on suicide watch with no assessment; the jail doctor who prescribed an over-the-counter pain reliever for a reported head injury without examining him, and the nurse who delivered that answer; the nurses who declined to issue his prescribed medication; the day-shift officer who refused to accept his letter to management; the night-shift sergeant who signed for it; the lieutenant who asked whether he was really going to sue; the second officer on the Plaintiff's right side who, with Rodriguez, applied pain compliance to a kneeling man and tried to split his fingers apart; and the two officers on the Plaintiff's left side who held him during the use of force and did not intervene. Their identities are in records held only by the

City of Las Vegas, which the Plaintiff requested on September 8, 2026 and has not received. The Plaintiff will amend to name them when the records are produced. The Plaintiff has been diligent in trying to learn their names. On September 8, 2026 he requested from the City, under NRS Chapter 239, the records that identify them; the City did not answer within the five business days NRS 239.0107 allows and has not answered since. He is filing with this Complaint a motion for leave to take early discovery directed to their identities, and he will move to substitute each true name promptly when it is learned. The JOHN DOE Defendants are named in the caption, and the claim against each is pleaded in the body of this Complaint, so that the substitution of a true name relates back to the date of this filing under Fed. R. Civ. P. 15(c)(1)(A) and NRCP 10(a). Nurenberger Hercules-Werke GmbH v. Virostek, 107 Nev. 873, 822 P.2d 1100 (1991); Butler v. National Community Renaissance of California, 766 F.3d 1191 (9th Cir. 2014).

14. Medical services at the City of Las Vegas Detention Center were provided under contract with the City by NaphCare, Inc., a private corporation. A private medical contractor that provides medical care to prisoners under contract with a government acts under color of state law. West v. Atkins, 487 U.S. 42 (1988). NaphCare, Inc. is not named as a Defendant in this action. The doctor and the nurses described below, whether employed by NaphCare or by the City, acted under color of state law and are sued here as JOHN DOE Defendants. The sick call form a nurse handed the Plaintiff on suicide watch carries NaphCare's name and is in Exhibit 2.

15. At all relevant times every individual Defendant acted under color of state law and within the course and scope of employment by the City of Las Vegas or its medical contractor.

## IV. STATEMENT OF FACTS

**A. Custody begins**

16. The Plaintiff was arrested on July 18, 2022 on a charge of driving under the influence, held overnight at the City of Las Vegas Detention Center, and released the next morning. No claim in this Complaint concerns that night. On December 12, 2023 the charge was reduced to reckless driving on a submittal. On December 12, 2024, in City of Las Vegas v. Robert Steele, Case No. C1268587, Las Vegas Municipal Court, Department IV, the Plaintiff appeared before Judge Bert M. Brown for the revocation hearing, knowing that a jail sentence would follow. Judge Brown revoked the submittal, entered a conviction for reckless driving, and sentenced the Plaintiff to ninety days with two days of credit. The Plaintiff asked for until the next morning to return his vehicle home and gather his belongings before surrendering. The request was denied and he was taken into custody from the courtroom.

17. The Plaintiff was booked into the City of Las Vegas Detention Center that day. The jail's Temporary Custody Record, attached as Exhibit 3, shows the arrest at 10:15 a.m. on December 12, 2024, booking at 2:55 p.m., arrest type "RM" for remand, and the charge as reckless driving, ninety days, two days credit.

18. The Plaintiff's appointed counsel's representation ended with the revocation hearing of December 12, 2024. From the moment he was remanded from the courtroom that day until his release he had no lawyer and was representing himself.

19. The Plaintiff declared a hunger strike on the morning of December 12, 2024 and maintained it for approximately forty-two days, ending on or about January 23, 2025.

**B. The refusal of appeal forms and the thirty-day rule**

20. Beginning on December 12, 2024, the day he was booked, and repeatedly afterward, the Plaintiff asked jail staff for the forms and paper needed to file a notice of appeal from his conviction. He asked in person and he asked in writing, on the jail's own Inmate Request for Assistance form. His copies of those forms are attached as Exhibit 2.

21. On December 14, 2024, his second full day in custody, the Plaintiff submitted a written request for appeal paperwork and court information. A receiving officer signed for it that day. (Exhibit 2, item 1, page 3.) On December 16, 2024 he submitted a written request for law library forms, listing a notice of intent to appeal, an appeal form, an in forma pauperis application and a transcript request. A receiving officer signed for it that day. (Exhibit 2, item 6, page 8.) On December 17, 2024 he submitted a written request, marked "LAW LIBRARY," for a notice of intent to appeal from a Las Vegas Municipal Court case to the district court. A receiving officer signed for it that day. (Exhibit 2, item 8, page 10.) All three were within the ten-day period to appeal. None was answered and no form was provided.

22. Jail staff refused. During his first three days of custody, while he was housed in general population, the classification officer assigned to that housing unit, an older Black man, told the Plaintiff, in substance, that he could not file anything with a court for the first thirty days of his custody. That classification officer is not Defendant Sergeant Cook.

23. During the first suicide watch, a Black sergeant, a smaller man of about five feet eight inches and about 150 pounds, told the Plaintiff that a sentence modification was the only thing he could file, and that a sentence modification was the only thing the sergeant would ask the classification officer to help him with. No one at any time offered the Plaintiff the option of filing an appeal.

24. The Plaintiff had no way to check either statement, because the jail had refused him

forms, transcripts, hearing video, and legal material, and gave him no access to a law library.

25. The Plaintiff knew a sentence modification was the wrong filing. He had agreed to the sentence and had no reason to expect a judge to modify it. He filled one out anyway, against his own judgment, because the sergeant had told him it was the only thing he could file.

26. The time to file a notice of appeal from a Las Vegas Municipal Court judgment to the district court is ten days. NRS 189.010, made applicable to the municipal courts by NRS 5.073(1) and NRS 266.595; see NRS 5.080. Whatever the exact route, no rule of Nevada law bars a prisoner from filing anything with a court for thirty days. A rule barring any filing for thirty days closed the Plaintiff's appeal window before he could use it.

27. On December 26, 2024, in open court before Judge Brown, the Plaintiff stated on the record that the jail was denying him the paperwork he needed. The certified transcript of that hearing records the statement.

28. The Plaintiff kept asking in writing. He submitted requests for a notice of intent to appeal on December 30, 2024 (Exhibit 2, item 11, page 13); on January 1, 2025 (item 12, page 14); on January 4, 2025, writing "This is the third time I have asked" (item 14, page 16); on January 7, 2025, asking also for ten sheets of pleading paper (item 18, page 20); and on January 20, 2025, asking also for his case number, judge and department, for the transcripts needed to file the appeal, and for a district court complaint form and in forma pauperis application (items 23, 24 and 25, pages 25, 26 and 27). Each was signed for by a receiving officer on the day submitted or the next. None was answered.

29. In all, between December 14, 2024 and January 21, 2025, the Plaintiff submitted more than twenty written requests on the jail's form, at least fourteen of which are identified by date in this Complaint. Exactly one received a written reply, the telephone request described in

Section G. The originals of all of them are in the City's records. The Plaintiff's own copy of his letter to jail management and of his sentence-modification request were not returned to him after trustees cleared his cell during the second suicide watch. When the Plaintiff put all of his notes together to go on the second suicide watch, he put them all in a plastic bag. He did not get that bag back when he left. The trustees who emptied his room took it with them and he never saw it again.

30. On or about December 29, 2024, Defendant OFFICER COOK took the Plaintiff out of his cell to the guards' office area, seated him at a table, and gave him a pencil and paper to fill out the sentence-modification form. The Plaintiff did not have his glasses and could not read what he was writing. Officer Cook told him he had fifteen minutes and that he could either fill the form out in that time without his glasses or go back to his cell and do nothing. Officer Cook is the white officer and is a different man from Defendant Sergeant Cook, who is Black. This was not the Plaintiff being given a pencil in solitary confinement. This was the Plaintiff being taken out of solitary confinement for about twenty-five minutes and given a pencil, which shows that the jail would trust him with a pencil. Officer Cook did not even stay by and watch him; he walked away while the Plaintiff sat at the table and did his work.

31. The jail therefore had a table, paper, a pencil and a place to sit when it wanted a filing of its own choosing. It gave the Plaintiff all of them for a sentence modification he had told staff was the wrong filing, and gave him none of them for the appeal he asked for in writing at least eight times, or for the medical request described in paragraph 52. The Plaintiff was on the first suicide watch on December 29, 2024. Ten days earlier an officer had refused him a pen on the ground that he was on suicide watch. The same watch, the same jail, and a pencil in his hand when the filing was the jail's idea.

32. The Plaintiff never obtained the forms and never filed a notice of appeal. The right to appeal was lost. The appeal he was taking was from Judge Brown's refusal to recuse himself,

the judge having given the Plaintiff advice from the bench.

33. After the Plaintiff was moved to the second floor on or about January 1, 2025, the classification officer for that floor, a heavyset woman, told him that he could file either a sentence modification or an appeal, but not both, and that because he had already filed a sentence modification she would not give him the appeal paperwork. She did not.

34. Before January 18, 2025 the Plaintiff wrote a motion to recuse Judge Kelly Giordani with a golf pencil on blank paper, because the jail had given him nothing else to write a filing with. On January 18, 2025 he asked in writing to file it at once; on or about January 20, 2025 he handed it to a classification officer for filing.

**C. Solitary confinement**

35. For his first three days the Plaintiff was held in a five-man cell in general population.

36. On or about December 14 or 15, 2024, while seated at a metal table, the Plaintiff slapped his hand flat on the table and swore. He did not stand, did not yell, and made no threat or threatening movement toward anyone. Officers filled the room. The Plaintiff was cooperative, was handcuffed without incident, and did what he was told. He was moved to solitary confinement on the ground floor. No one told him why, and he was never told afterward. A slap on a table would not, by itself, have put a man in solitary confinement for the rest of his custody. The Plaintiff can only assume the jail used it as an excuse to punish him for the hunger strike, because a man on a hunger strike has to be watched more and checked on more often, and the jail did not want to deal with that.

37. The Plaintiff remained in solitary confinement from that day until his release, first on the

ground floor and, from on or about January 1, 2025, on the second floor. That is approximately forty-five continuous days. On January 7, 2025 he told Judge Giordani on the record that he had been in solitary confinement for twenty-four days; the certified transcript records it. It was in solitary confinement that the jail's staff first set about breaking his hunger strike.

38. During the ground-floor period, approximately December 15, 2024 to January 1, 2025, the Plaintiff was not permitted to shower. That is approximately seventeen days. He was first allowed to shower after the move to the second floor.

**D. The first suicide watch**

39. On December 14, 2024 the Plaintiff submitted a written request to speak to a psychologist for personal reasons. A receiving officer signed for it. No one came. (Exhibit 2, item 5, page 7.)

40. On or about December 16 or 17, 2024, a day or two after he was moved to solitary confinement, the jail sent the Plaintiff to University Medical Center for blood tests and a check on his condition because of his hunger strike. Two City officers transported him, one of whom was an officer named Perez. He left the jail at dusk and returned after dark.

41. In the inmate waiting area at University Medical Center, officers of the Clark County Detention Center, a separate jail run by the Las Vegas Metropolitan Police Department that is not a party to this action, harassed the Plaintiff while the two City officers sat and watched. One of them, a bald white man in his late thirties or early forties, told the Plaintiff that if he ever got him into the Clark County Detention Center he would make his life miserable, said that they had abused another prisoner there so badly that the man cried when he left, and said repeatedly that Marines were cowards and that they made Marines cry all the time. Later a

short white sergeant with gray hair, in his late fifties or sixties, told the Plaintiff on his own that he had better not show up at the Clark County Detention Center or he would pay for what he was doing that day. The exchange became a shouting match. Those officers wore body-worn cameras. The two City officers did nothing.

42. On the return to the City jail, while the City officer who was not Officer Perez was pushing the Plaintiff in a wheelchair from the transport van to the housing unit, that officer told the Plaintiff that he did not like his attitude and said, in substance: "We can always put you on suicide watch, you know."

43. The Plaintiff took that as the threat it was, and he answered it with defiance. When the nurse checked him back into the jail he told her, in an aggressive tone, that he was feeling suicidal and thought he needed to go on suicide watch, and he asked her whether there was anything else they could do to him to break him, because if there was they could skip straight to it and save everyone some time. She told him that this was all they could do. Nothing in his words or his delivery could have been mistaken for a depressed man reporting an intention to harm himself.

44. No one assessed the Plaintiff. No clinician asked him whether he meant it. He was placed on suicide watch on or about December 17 or 18, 2024, on a statement that was, on its face and in its delivery, a defiant answer to an officer's threat. An officer had just told him that suicide watch was something the jail could "always" do to a man whose attitude he did not like. Within hours the jail did it, and then kept him on it for fifteen days without any clinical review of whether he belonged there.

45. He remained on that watch for fifteen days, until on or about January 1, 2025. That is the count from the dates he can give; on December 26, 2024 he told the Municipal Court on the record that he had then been on the watch nine days. The exact dates are in the City's housing

and classification records, which the Plaintiff has requested and has not received.

46. The Plaintiff was issued a suicide gown. It was too small for him, and its Velcro fastenings were old and so clogged with lint that they would not hold. The gown would not stay on. He gave up trying to wear it and was naked for the whole of that period. His mattress and all of his property were taken. He slept on the bare concrete floor. Apart from the gown that would not stay on, he was given four sheets of toilet paper. The only other things handed to him on that watch were two blank forms, described below, with nothing to write on them with.

47. The cell was cold, and colder at night, when air blew on him. The lights stayed on twenty-four hours a day and a fixture above the sink shone into his eyes when he lay on his right side. The window looked out under a street light that never went off. He could not tell day from night.

48. Officers conducted the routine fifteen-minute checks through a glass window in the cell door. Female officers conducted many of them.

49. The cell was cold enough that the Plaintiff's genitals contracted and his testicles drew up into his body, as a man's body does in cold. Officers of both sexes looked in at him naked at every check. On several occasions, after looking in, they laughed and made remarks through the door about the size of his genitals. He could hear them. The mockery was directed at his sex organs, it was inflicted by the people responsible for his care, and it went on for fifteen days. It was sexual humiliation.

50. He did not sleep for days at a time.

51. About halfway through, a mentally ill inmate who screamed and sang at the top of his

lungs all day was moved from further down the hall into the cell directly across from the Plaintiff. An officer asked the Plaintiff how he liked his new roommate.

52. On or about December 19, 2024, during a night nurse's round on that watch, the Plaintiff asked for medical attention. He asked to have his prescribed heart medication filled. The nurse handed him a NaphCare sick call form through the portal in the cell door. The portal is a slot about four inches by ten inches, set about two and a half feet above the floor, with a flat shelf under it wide enough to write on. She would not fill the form out for him. The officer escorting the round, an older woman with red hair, stood at the door and saw the nurse pass him the form. When the Plaintiff asked her for a pen, she told him he could not have one because he was on suicide watch, and that he should not have been given the form at all. The nurse and the officer then laughed and walked away.

53. Both of them knew, as they walked away, that the Plaintiff had a medical form and no way to write on it. The nurse could have written down what he told her and held the form on the shelf under the portal for him to sign, which is what the shelf is there for. She did neither. Handing a man on suicide watch a form he is forbidden the means to fill out, and laughing at the door on the way out, is not a refusal of care alone. It served no purpose but to torment him.

54. The Plaintiff filled the form out by scratching the words into it with a fingernail so that the carbon copies would carry them. That form bears no date, because he had nothing to write a date with. His own jail notes fix the day. The form is in Exhibit 2. (Exhibit 2, item 9, page 11.)

55. On December 24, 2024 the Plaintiff wrote out an Inmate Request for Assistance the same way, scratching the words into the paper with a fingernail, for the same reason: no one would give him anything to write with and no one would write it for him. A receiving officer signed for it on December 24, 2024. His copy, bearing only the impressions, is in Exhibit 2. (Exhibit

2, item 10, page 12.) Those two forms are the only writing the Plaintiff was able to produce during the first watch.

56. The Plaintiff was fifty-nine years old and on a hunger strike throughout.

57. The jail's nurse asked the Municipal Court more than once to release the Plaintiff on medical grounds. On December 26, 2024, when the Plaintiff was brought before Judge Brown and told the court on the record that he had been on suicide watch for nine days, Judge Brown stated on the record that the jail had made a medical release request and that he had denied it; at that hearing he also found the Plaintiff in contempt for words he spoke in the courtroom that day and added twenty-five days. On December 31, 2024 Judge Giordani denied a further request. The Plaintiff recalls a third request; the court's record will fix the number.

58. The Plaintiff was given a gown that would stay on, and a blanket, only a few hours before he was taken off the watch on or about January 1, 2025. Somewhere about halfway through the watch the Plaintiff threw such a fuss about the gown that he eventually got the guards to agree to get him a new robe. Five hours later he was still begging for the new robe they had promised him. The new robe was worse than the one he was wearing. It was so bad that he gave it back to them. Unfortunately for them, they were then able to go ahead and get him a practically brand new, barely used robe that was big enough to fit him, four or five hours before they moved him upstairs and took him off suicide watch, and at the same time they gave him the suicide blanket. This is yet another way they were trying to torment him into giving up his hunger strike and punishing him for his belligerence at their treatment of him.

59. The Plaintiff does not believe the conditions they were leaving him in were City procedure. He believes it is the opposite: they were abusing him. They purposely left him with a robe that was malfunctioning and too small, which is displayed by the fact that they gave him a perfectly fine robe a couple of days later, and no one else was on suicide watch as long

as he was, so they had the opportunity at some point to get him that same gown and chose not to. It is further displayed because the second time he went on suicide watch the guard was bringing a robe and a suicide blanket to his cell for his suicide watch. The Plaintiff remembers this because he reminded the guard through the porthole on the door of the day room that he was going on suicide watch and said, “we don't do blankets on suicide watch, and you can keep the robe. It made it too easy last time.” That is a further display of his defiance and that he was not in any way displaying suicidal tendencies. He was obviously doing this out of belligerence and to fight for his court date. The fact that he got his court date so quickly after he went on suicide watch shows that he had the proper tactic to actually get his legal rights out of the jail staff despite their best efforts to stop him. A nurse told the Plaintiff that the jail used to issue a suicide blanket to inmates on watch and that someone in management had decided to stop.

60. A nurse assessed the Plaintiff every day he was in solitary confinement on the first suicide watch. She told him that he could not get off suicide watch until he ate.

61. While she did so the nurses asked him constantly whether he was really going to stick it out and go on feeding tubes. The Plaintiff always replied, in substance: if the prisoners in Guantanamo Bay can go to feeding tubes, you can damn well bet that as a United States Marine I will. That exchange was an acknowledgment by everyone present that there was no chance the Plaintiff was going to be able to commit suicide by not eating.

62. The Plaintiff was constantly letting the nurses know that he was doing his fasting in a healthy manner and drinking the water he needed to. At no time did anyone ever get the actual impression that the Plaintiff had any intent of killing himself.

63. That is displayed further by the fact that the Plaintiff was taken off the suicide watch after fifteen days without having to eat. They left him on suicide watch as a form of additional

punishment. It also clearly shows that they were using the suicide watch as a form of torture in order to break him of the hunger strike. It was never based on any kind of medical fact or observation by a professional that was an honest assessment of the situation. The nurse who assessed him every day should have had him off suicide watch much earlier, and she should not have been telling him that he had to give up his hunger strike just to get the privilege of being treated like a human being again.

**E. The second suicide watch and the use of force**

64. On or about January 20, 2025, after five weeks of unanswered written requests and with no way to get his case in front of a judge or get his appeal papers, the Plaintiff asked to be placed on suicide watch. To be placed on it he had to say that he was suicidal, and he said it. No one in the room believed it. It was obvious to everyone present, and the Plaintiff made it plain, that he was doing it in protest because he could not get a court date and could not get the paperwork he needed filed, and that it was the only way he knew to force the jail to move his case. The second suicide watch was the same as the first. On the second watch the Plaintiff had told them why he was doing it. He had packed his things to be moved, which is how he knows he is missing a folder of paperwork. When the guards sat in front of him in the day room and brought in the nurse, he said the magic words for suicide watch, but no one believed it.

65. A member of the jail's medical staff came to the day room and asked the Plaintiff a series of questions. On the Plaintiff's answers, that staff member declared him suicidal and he was placed on the watch. Twenty or more corrections officers were present. They moved him like a rabid animal that was going to strike out at any time: four guards with their hands on him and another twenty in the hallway, to move him from the day room to the cell next door. They were out to break him and punish him and make sure he could not fight anything. This was the move in which the Plaintiff got his concussion and his arm ripped up. All of these guards were

out to punish him and break him for standing up for his rights in a legal protest. This display of spectatorship, where the guards including management all came to watch the crazy inmate being taken to his cell, shows that the Plaintiff was now a show for the guards. He was a challenge, to see whether or not they could abuse him enough to break him. There were officers, sergeants and a whole lot of guards all sitting around watching him do this, and at no time did any of them ever believe for one minute that he was suicidal. Defendant SERGEANT COOK was present for that transfer from the cells and oversaw the determination that the Plaintiff was suicidal and not just protesting because his department would not do its job. The Plaintiff specifically chewed Sergeant Cook out through the glass when he came to the hall to watch the show, and yelled at him because his department was not doing their job. The jail again took his mattress and property and put him on the bare floor. On that watch he had a suicide gown that stayed on.

66. At approximately 1:00 a.m. on or about January 20 or 21, 2025, as the Plaintiff was being moved from the day room to his cell to be placed on the second suicide watch, four officers took hold of him while he was kneeling in the corner of the cell. The two officers on his left side held him without incident. They used no pain compliance and he gave them no trouble.

67. The two officers on his right side, Defendant RODRIGUEZ and one other, applied pain compliance holds to his right hand and arm and tried to split his fingers apart. The Plaintiff was kneeling, was held by four officers, had complied with every order given to him, and was doing nothing that called for force of any kind.

68. Because the two officers on his right were hurting him for no reason, the Plaintiff pulled his hand out of their grip. He did not strike at anyone, did not rise, and did not threaten anyone.

69. At that moment Defendant RODRIGUEZ drove his arm into the side of the Plaintiff's

head and, with his full body weight behind the blow, drove the left side of the Plaintiff's head into the concrete wall.

70. The Plaintiff was fifty-nine years old. He was cooperative throughout his custody and followed every order he was given. He had watched officers pepper-spray an inmate in the cell across the hall for refusing to comply, and the spray had burned his own lungs from across the corridor. He knew there was nothing to be gained by resisting, and he did not resist. The force served no legitimate correctional purpose.

71. The Plaintiff suffered an injury to his head and an injury to his right shoulder, which he believes to be torn cartilage. He has had pain and limited use of the shoulder since. Magnetic resonance imaging of the right shoulder was performed on September 16, 2026 and the report is pending.

72. The protest produced a hearing. On January 22, 2025 Judge Giordani reduced his sentence by ten days.

73. When he returned from that hearing the Plaintiff asked to be taken off the watch. The nurse who came to clear him off it told him that this was his third time on suicide watch and that she was going to leave him on it another twenty-four hours to punish him for going on suicide watch so much. It was his second time. The nurse had been on days off; she had seen him on the first watch, which ran fifteen days, and on finding him on the watch again she assumed he had been on it twice before. The reason she gave for keeping him on the watch was punishment, not any concern that he would harm himself. She did not carry the threat out; the sergeant described in the next paragraph took him off the watch that day. That nurse was a young Black woman. She is the same one who placed the Plaintiff on suicide watch a third time, just before he left, as described below, and who forced him to take the ambulance.

74. The Plaintiff then demanded to be strapped into the restraint chair. He was left in the cell; the cell was not the problem. The problem was that he had a concussion and could not lay his head down, and because he did not have a mattress or a pillow he could not rest his head, because it could only sit on the cement floor. That is why he demanded they put him in the restraint chair, if they were not going to give him a pillow or something to put under his head to keep it off the concrete. He could not lay on his arms either, because of his newly torn and sore shoulder; he could not lift his arm above his shoulder to be able to place it under his head. His plan was to get himself strapped in the restraint chair without any pants on so that he could keep his head off the ground and sleep sitting up, and if he needed to use the restroom or anything he would just defecate on the metal chair. This is how bad it was for him on suicide watch the second time with the concussion. He could not lay down at all. He had to either walk or sit. Any attempt to lay his head on the concrete ended up with him in pain. An officer had told him earlier that even if the nurse released him from the watch it would take three or four hours. The officer on duty did not know what to do with the demand and called a sergeant. The sergeant asked for two minutes, made a telephone call, and the Plaintiff was removed from suicide watch at once. What the jail had said would take three or four hours took two minutes when a sergeant chose to make a call. He came off the watch that day, on or about January 22 to 24, 2025. The jail's watch records fix the day.

75. There was a third suicide watch. It came just before the Plaintiff's release, and it was done as punishment. The Plaintiff and the nurse described above got into a confrontation. The nurse threatened to put him on suicide watch before he left, so that he would have to go to the hospital before he could go home. The Plaintiff answered the threat by telling her, in substance, fine, you can give me a ride, but I want to know who is going to pay for the ambulance because I am not. That is when she told him that the City would pay for the ambulance and for the hospital. He was placed on the watch.

76. That placement was not a response to any risk that the Plaintiff would harm himself. It

was the nurse's answer to an argument, and it was used to make his release run through a hospital. The nurse's remark on the second watch that it was his "third time" was wrong when she said it. The third time was this one.

**F. Medical care**

77. A corrections officer was present at every contact the Plaintiff had with medical staff during his custody. He was never examined, questioned or answered by a nurse or a doctor out of an officer's hearing. Corrections officers, not medical staff, handled and screened the written medical requests before they reached anyone medical.

78. After the use of force the Plaintiff reported his head injury and his shoulder injury to jail staff and asked to be examined and treated. He submitted a written medical request stating that he had headaches and that he was dizzy when he stood up or walked, and asked for help with a concussion.

79. In late January 2025, in answer to that request, a jail doctor, without seeing the Plaintiff, prescribed an over-the-counter pain reliever. A nurse delivered the answer and told the Plaintiff that this was all the doctor could do for him. An officer was present when she did.

80. No doctor, nurse practitioner or other provider examined the Plaintiff at any time after he reported the head injury. No imaging was ordered. The doctor who prescribed the pain reliever had the Plaintiff's written report of headaches and dizziness in hand when he did so.

81. Before his custody the Plaintiff had been prescribed clonazepam and trazodone to sleep. He reported this to the jail's nurses. He was told there was nothing they could do because they could not issue sleeping medication. No doctor evaluated him. He went without the medication

for the whole of his custody, through the hunger strike and all three suicide watches.

82. His head and shoulder injuries were not treated at any time before his release.

83. On release, on or about January 28, 2025, jail staff required the Plaintiff to leave by ambulance and told him the jail would pay. He was on the third suicide watch when he was released. The nurse who had placed him on it told him that they would not be able to let him go, that they were going to have to send him to the hospital, that if he did not agree to go he would be kept in custody longer, and that the City would pay for the ambulance and the hospital. That is the only reason he got into the ambulance. He was billed approximately $4,000 for the ambulance and approximately $2,000 by University Medical Center.

**G. The letter to jail management, the telephone, and the video**

84. The Plaintiff was unable to call his family for more than a month. On January 18, 2025 he submitted a written request stating that his telephone PIN did not work and that he had not used any of his telephone time, demanding his telephone time, and adding: "It's your lawsuit, your career's funeral." A receiving officer signed for it that day.

85. On the same day, January 18, 2025, the Plaintiff submitted a second written request stating that he needed to file his motion to recuse at once, that he needed a court date, that the jail was already in violation of his civil rights, and that he was suing the City for it. A receiving officer signed for it that day. Both forms are in Exhibit 2.

86. During his custody the Plaintiff wrote a letter to jail management by hand. It ran about ten pages. It stated that he intended to sue the City over the jail's refusal to give him access to the courts and over his treatment; it set out his complaints one by one; and it stated that he had

expected to be filing an appeal from his first day in custody and should have been released early. He submitted it at the same time as his written request for the replacement of his telephone time, on or about January 18 to 20, 2025.

87. The letter was blunt and angry about the jail's performance, and it said so in aggressive language. The Plaintiff first offered it to the day-shift officer assigned to his floor. That officer read it, told the Plaintiff he had some points, understood that it was a complaint against the jail addressed to management, and refused to take it. He did not want to sign for a letter he would then have to hand up to management. That officer worked the floor regularly alongside an officer named M. Carter.

88. The Plaintiff then presented the letter to the night-shift sergeant. The sergeant read it and told the Plaintiff he had some valid complaints. He did not want to sign for it either, for the same reason: a signed receipt meant the letter went to management. He kept working on the Plaintiff's telephone request instead, without signing for the letter and without returning the Plaintiff's copy of the request form to him that night. The Plaintiff did not refuse to hand him the letter. He would not let the sergeant leave without signing the paperwork and acknowledging that he had received it. The sergeant kept insisting that he could just go down and get the phone taken care of, and was doing everything he could not to sign the request and the acknowledgment of his receiving the letter. Both of them acknowledged that the jail had screwed up and were nervous about giving the information to management. This had happened once before, with another guard who refused to take something written by the Plaintiff because it was not written in a way that was acceptable to the guard. The Plaintiff was at no time required to use any particular set of verbiage to be able to address his complaints against management, and the guard had no right to tell him that he had to edit the document. That guard is a young white man with dark hair, in his twenties or early thirties, and he was working on the second floor. The sergeant signed it. He signed that acknowledgment on or about January 18 to 20, 2025, the same night he took the Plaintiff's telephone request.

89. The jail answered the January 18 telephone request in writing on January 20, 2025, giving the Plaintiff his PIN. It is the only written request the jail answered during the Plaintiff's custody, and the answered copy is in Exhibit 2. The letter to management was delivered to the sergeant in the same period, and the sergeant who signed for it is the one who handled the telephone request.

90. The Plaintiff was issued a telephone PIN when he was booked into the jail on December 12, 2024. He did not get to use it before he was moved to solitary confinement, and from that point he had no access to a telephone. On January 18, 2025 he asked in writing for his telephone time. The jail's written answer, dated January 20, 2025, gave him his PIN. A request he submitted at 6:30 a.m. on January 20, 2025 states that his telephone time had been taken by an inmate who had watched him enter his PIN and had used it. On January 21, 2025 he submitted a further written request stating that his fifteen minutes of free telephone time was gone and that he could not call his family. He addressed that request to Defendant SERGEANT COOK by name because he understood Sergeant Cook to be in charge of the classification department. He did not give it to Sergeant Cook. He handed it to the officers on duty, who refused to sign for it, and the Plaintiff wrote that refusal on the form. His first call, when he was able to make one, was to his son, Max Steele. The Plaintiff does not know who took his telephone time and does not allege that Sergeant Cook took it. What he alleges is that the time was gone and that he asked in writing for it to be restored. The telephone vendor's account and call records will fix the sequence and the dates.

91. Afterward a lieutenant of the City of Las Vegas Detention Center, who had spoken with the Plaintiff on several occasions and appeared to be following his case, asked the Plaintiff whether he was really going to sue. The same lieutenant also told the Plaintiff that they were trying to find a way to get him out early.

92. From January 18, 2025 forward the City had written notice that the Plaintiff intended to sue over his custody: the two request forms of that date, each signed for by a receiving officer, one of them answered in writing by the jail; the letter to management; the sergeant's signed acknowledgment of the letter; and the lieutenant's question. The letter identified the conduct he intended to sue over.

93. A written notice of intent to sue, identifying the conduct complained of, delivered to a supervisor who signed for it and stated that the complaints were valid, made litigation reasonably foreseeable to the City. From that night the City had a duty to preserve every recording and record relating to the conduct described. No separate request to preserve video was required for that duty to arise, and any reasonable jail administrator who received the letter would have preserved the recordings. The letter also stated that the Plaintiff had expected to file an appeal from his first day in custody. A jail administrator reading it would have understood that the conduct complained of began on December 12, 2024, so that the duty to preserve reached the whole of the Plaintiff's custody and not only the days after the letter was delivered. The officers who took the Plaintiff to the hospital had body cameras, which recorded what happened at the hospital. That recording matters because it is evidence that the Plaintiff was threatened by the Clark County Detention Center officers who were threatening him while he was forced to wait in the inmate waiting area and could not leave or escape these men, and that his own officers did not in any way protect him or tell the other officers to leave him alone. The Clark County guards provoked him and pushed him into a heated argument in which he was shouting at the top of his lungs and disturbing the entire emergency room waiting area, disruptive enough that he was put out of the hospital. The guards who were with him should have told the other guards to back off and stop talking to their prisoner because they were agitating him. They just sat there and watched.

94. The Plaintiff could not have framed a more particular demand. He had no lawyer, no access to a law library, no legal materials, and no rules of procedure, because the City had

refused him all of them. Of the more than twenty written requests he submitted, the City answered one. The City cannot fault the form of a notice from a man it had cut off from every means of learning the form, and from any means of writing one.

95. The Plaintiff does not know whether the City preserved its video. He believes it did not. On information and belief, recordings of the Plaintiff's housing units, both watch cells, and the location of the use of force were allowed to be overwritten after the City had that notice. Whether any recording survives is known only to the City, which has not answered the Plaintiff's September 8, 2026 records request.

**H. The City's policies and practices**

96. The City of Las Vegas Detention Center had no grievance procedure and no form or process by which an inmate could complain about staff conduct. The City publishes no inmate grievance procedure for that facility. The City's only complaint policy, Personnel Complaints Policy 1010, took effect on September 15, 2025, after the Plaintiff's release, and requires a website, telephone or mail.

97. The City had no system for delivering an inmate's court filings to a court, and gave inmates no forms or paper for that purpose.

98. Classification officers and sergeants, none of them lawyers, told inmates what they could and could not file with a court, and the advice they gave was wrong: no rule of Nevada law bars a filing for thirty days, and no rule requires a prisoner to choose between a sentence modification and an appeal.

99. Corrections officers, rather than medical staff, screened inmates' written medical

requests, and a corrections officer was present at every contact between an inmate on watch and medical staff.

100. The thirty-day bar on filing, the removal of clothing, mattress, blanket and shower access from anyone on suicide watch, the issuance of worn-out suicide gowns, the refusal of any writing instrument to an inmate on the first suicide watch, including an inmate handed a medical form and asked to complete it, and officer screening of medical requests were standing practice at the facility and were applied to the Plaintiff as such. So was the use of suicide watch as a threat and a punishment: an officer told the Plaintiff that the jail could "always" put him on suicide watch because the officer did not like his attitude, and within hours it did. So is the fact that the Plaintiff freaked out once when Officer Carter threatened the individual in the cell next to his with suicide watch if he did not behave. This is another example of them using suicide watch as a punishment and a form of torture. It is also an acknowledgment that that is what suicide watch is: torture until the inmate says the right thing. It is in no way treatment of someone who might actually be suicidal. The City of Las Vegas Detention Center also makes no complaint form available to inmates for reporting violations by its guards. There is no way for an inmate to complain about what is described in this Complaint or to make an official record of it.

## V. CLAIMS FOR RELIEF

### COUNT ONE: Excessive Force

42 U.S.C. § 1983; Eighth Amendment, applied to the States through the Fourteenth Amendment

**Against Defendant RODRIGUEZ, Defendant SERGEANT COOK, and JOHN DOES 1 through 100**

101. The Plaintiff incorporates every preceding paragraph.

102. At the time of the use of force the Plaintiff was a convicted prisoner serving a sentence. The Eighth Amendment governs.

103. Defendant RODRIGUEZ and a second officer applied pain compliance holds to a fifty-nine-year-old man who was kneeling, held by four officers, and complying with every order. When the Plaintiff pulled his hand out of a hold that was being applied for no reason, Defendant RODRIGUEZ drove the Plaintiff's head into a concrete wall with his full body weight. The withdrawal of a hand from a gratuitous pain hold is not resistance, and a blow of that kind is not a response to it.

104. That force was not applied in a good-faith effort to maintain or restore discipline. It was applied maliciously and sadistically to cause harm. Hudson v. McMillian, 503 U.S. 1 (1992); Whitley v. Albers, 475 U.S. 312 (1986).

105. The second officer on the Plaintiff's right side took part in the gratuitous pain compliance. The two officers on his left side, holding him at the time, had a reasonable opportunity to intervene and did not. Defendant SERGEANT COOK was present in the hallway for the move, with roughly twenty other officers, and watched. A sergeant standing feet away from four officers holding a kneeling, compliant prisoner had both the authority and the opportunity to stop what was done to him, and did neither.

106. The Plaintiff suffered a head injury, an injury to his right shoulder, pain, continuing physical limitation, and mental anguish.

## COUNT TWO: Retaliation

42 U.S.C. § 1983; First Amendment

**Against Defendant SERGEANT COOK and JOHN DOES 1 through 100**

107. The Plaintiff incorporates every preceding paragraph.

108. The Plaintiff engaged in protected conduct. He asked for the forms to appeal his conviction, he told the Municipal Court on the record that the jail was denying him those forms, he submitted written requests, and he delivered a written letter to jail management stating that he intended to sue. Rhodes v. Robinson, 408 F.3d 559, 567-68 (9th Cir. 2005).

109. The protected conduct came in two waves and so did the retaliation, but the retaliation did not begin at the door. The refusal of appeal forms and the thirty-day statement were the working of a rule, and they are pleaded in Counts Three and Six. The first act aimed at the Plaintiff himself was the move to solitary confinement on about his third day. A slap on a table would not alone have earned it. The Plaintiff can only assume the jail used the slap as an excuse to punish him for the hunger strike, because a man on a hunger strike has to be watched more and checked on more often and the jail did not want to deal with that. He was never told why he was moved. The next was the transport officer's threat on or about December 16 or 17, 2024 that the jail could "always" put him on suicide watch, made because the officer did not like his attitude after Clark County officers had baited him at the hospital, and the jail's placement of him on that watch within hours, on a defiant answer to that threat, with no assessment and no clinical review for fifteen days. That placement was punishment for what he said, and it is pleaded as punishment in Counts Four and Six. The retaliation for petitioning began afterward. On December 26, 2024 he told the Municipal Court on the record that the jail was denying him his paperwork, and the jail answered none of the written requests that followed, on December 30, 2024 and on January 1, 4, 7 and 20, 2025, while it had answered nothing before either. On or about December 19, 2024, two days after the watch began, the

JOHN DOE Defendants refused him a pen to complete a medical request a nurse had just handed him.

110. The second wave followed the letter and the two written requests of January 18, 2025 in which the Plaintiff stated that he was suing the City. When the jail restored his PIN on January 20, 2025, two days after those statements, his free telephone time was gone. After the Plaintiff used a request for suicide watch to force a court date, the nurse who came to clear him off the second watch told him she would keep him on it another twenty-four hours to punish him for going on suicide watch so much. Just before his release the same nurse placed him on suicide watch a third time, as punishment, after a confrontation, so that he could not simply walk out but had to be sent to the hospital first. She told him the City would pay for the ambulance and the hospital, and on that assurance he got in. He was billed for both.

111. Defendant SERGEANT COOK oversaw the determination on or about January 20, 2025 that the Plaintiff was suicidal. He knew the Plaintiff was protesting, because the Plaintiff shouted at him through the glass that this was happening because his department would not do its job. He let the Plaintiff be declared suicidal and moved by twenty officers anyway. That was retaliation for the Plaintiff's complaints about the department he ran.

112. Those acts would chill a person of ordinary firmness from exercising the right to petition the courts, and they advanced no legitimate correctional goal.

113. The Plaintiff suffered physical harm, isolation from any help including his family, torture, sexual humiliation, a head injury and a torn shoulder left untreated, fifteen days naked on a concrete floor under lights that never went out, days at a time without sleep, the mockery of his body by officers of both sexes, the loss of his right to appeal, and severe and continuing mental anguish.

**COUNT THREE: Denial of Access to the Courts**

42 U.S.C. § 1983; First and Fourteenth Amendments

**Against the CITY OF LAS VEGAS, Defendant OFFICER COOK, Defendant SERGEANT COOK, and JOHN DOES 1 through 100**

114. The Plaintiff incorporates every preceding paragraph.

115. The Plaintiff had a right of access to the courts, including the right to file a notice of appeal from his conviction within the ten days the law allowed.

116. The Defendants refused him the forms, the paper, and the means to file; told him that nothing could be filed during his first thirty days in custody; told him a sentence modification was the only thing he could file; steered him into a sentence modification he knew to be futile, on fifteen minutes and without his glasses; and then told him that having filed it he could not appeal.

117. The jail produced a table, paper and a pencil on or about December 29, 2024 for the one filing it wanted him to make. It produced none of those things for the appeal he asked for in writing on December 14, December 16, December 17 and December 30, 2024 and on January 1, January 4, January 7 and January 20, 2025. The means to file existed. They were given for one filing and withheld for the other.

118. Defendant SERGEANT COOK was the head of the classification department, the department responsible for obtaining court dates for inmates and for providing inmates with legal paperwork. The classification officers who told the Plaintiff that nothing could be filed for thirty days, who refused him appeal forms, and who steered him into the sentence modification, including Defendant OFFICER COOK, worked under him. The Plaintiff's

written requests for appeal forms, court information and pleading paper were delivered to the jail and signed for by receiving officers; the department Sergeant Cook headed answered none of them. On information and belief, Sergeant Cook knew of and acquiesced in the practice under which classification officers told the Plaintiff that nothing could be filed for thirty days and that a sentence modification was the only thing he could file.

119. The Plaintiff suffered actual injury in two ways. First, for more than five weeks, from December 14, 2024 to January 20, 2025, he asked the jail in writing for a court date and for the means to put his case before a judge, and the jail answered none of those requests. He got before a judge only by declaring himself suicidal on or about January 20, 2025. When the Municipal Court heard him on January 22, 2025 it cut ten days from his sentence. Every day between the first unanswered request and that hearing was a day the jail's refusal kept him from the court, and that delay is an injury that does not depend on whether his conviction was valid. Second, and in the alternative, he lost the appeal itself. The ten days to appeal ran from the judgment of December 12, 2024 and closed on or about December 22, 2024 while the jail was refusing him the forms. The appeal he was prevented from filing was not an attack on the conviction. Its subject was Judge Brown's refusal to recuse himself, which the Plaintiff had requested on September 5, 2024 and again on December 12, 2024 while his federal filing against that judge was pending; the Municipal Court's own reassignment of the case to another department between December 26 and December 31, 2024 shows that the court itself treated that filing as a conflict. The appeal was not frivolous, and it is lost for good. Lewis v. Casey, 518 U.S. 343 (1996); Christopher v. Harbury, 536 U.S. 403, 415 (2002).

**COUNT FOUR: Conditions of Confinement**

42 U.S.C. § 1983; Eighth Amendment, applied to the States through the Fourteenth Amendment

**Against Defendant SERGEANT COOK, JOHN DOES 1 through 100, and the CITY OF**

**LAS VEGAS**

120. The Plaintiff incorporates every preceding paragraph.

121. For fifteen days in December 2024 the Plaintiff, a fifty-nine-year-old man on a hunger strike, was held on a bare concrete floor in a cold cell with the lights on around the clock, without a shower, without a blanket, without anything to write with, in a gown that would not stay on so that he was naked in effect, displayed naked to officers of both sexes at every routine check, mocked through the door for the effect of the cold on his genitals, and unable to sleep for days at a time. For approximately three days in January 2025 he was again held on a bare floor without a mattress, and the nurse who came to clear him off that watch told him she would keep him on it a further twenty-four hours as punishment. Just before his release the same nurse placed him on suicide watch a third time, as punishment, after a confrontation with her. Defendant SERGEANT COOK oversaw the Plaintiff's placement on the second watch, knowing it was a protest and not a suicide risk, and let the conditions of that watch be imposed on him.

122. Nevada sets minimum standards for its local jails. The State Board of Health adopts them under NRS 444.335 and they appear in Chapter 211 of the Nevada Administrative Code. NAC 211.320(3) requires that cells used to house inmates be heated so that the air temperature inside does not fall below 65 degrees Fahrenheit. NAC 211.340(1) requires that every inmate detained overnight be furnished a flame-retardant and water-repellent mattress and pillow, a sheet or cloth mattress cover, and a blanket. NAC 211.350(4) requires the operator of the institution to meet the hygienic needs of all inmates. NAC 211.540(4) requires that under normal operating conditions each inmate be given the opportunity to shower once a day. The City met none of these standards in the Plaintiff's case.

123. NAC 211.340(1) permits an item of bedding to be withheld only where, in the judgment

of the jailer or other person in charge of the institution, that item would be a hazard to the institution or to the inmate because of that inmate's behavior, mental condition or intoxication. The exception is written around the individual and requires a judgment about him. No one made such a judgment about the Plaintiff. A nurse told him the jail had stopped issuing suicide blankets because someone in management decided to stop. A standing rule that strips the mattress, the blanket and the clothing from every inmate placed on watch is the opposite of the individual judgment the regulation allows, and it is no answer at all to the rest. There is a difference between taking things away to prevent an inmate from hurting himself and torturing and punishing him for being mentally ill. Suicidal ideation is a mental illness. It is not a reason to be tortured. NAC 211.540(4) allows a shower less often than daily only where the operator determines that the inmate's activities do not require a daily shower. No one made that determination about a man held alone in a cell for seventeen days, and the City cannot make it now. NAC 211.320(3) allows no exception for a cell kept below 65 degrees. A gown whose fastenings no longer held left the Plaintiff naked, and a naked man on a concrete floor for fifteen days is not a man whose hygienic needs were met under NAC 211.350(4).

124. The denial of usable clothing, bedding, sleep and basic hygiene for those periods deprived him of the minimal civilized measure of life's necessities. Rhodes v. Chapman, 452 U.S. 337 (1981).

125. The Defendants knew of and disregarded the substantial risk of serious harm those conditions posed to a man of his age who had been without food for weeks. Farmer v. Brennan, 511 U.S. 825 (1994).

126. The Plaintiff suffered sleep deprivation, weight loss, physical deterioration and severe mental anguish.

**COUNT FIVE: Deliberate Indifference to Serious Medical Needs**

42 U.S.C. § 1983; Eighth Amendment, applied to the States through the Fourteenth Amendment

**Against JOHN DOES 1 through 100 and the CITY OF LAS VEGAS**

127. The Plaintiff incorporates every preceding paragraph.

128. The JOHN DOE Defendants named in this Count include the doctor and the nurses who treated or refused to treat the Plaintiff, whether they were employed by the City of Las Vegas or by NaphCare, Inc. under its contract with the City. Both acted under color of state law. West v. Atkins, 487 U.S. 42 (1988).

129. A prescribed heart medication that a man on a hunger strike asks to have filled, a head injury sustained in a use of force, a shoulder injury with continuing pain and loss of use, and the withholding of prescribed medication from a man on a hunger strike are serious medical needs.

130. The Defendants knew of them. On or about December 19, 2024 the Plaintiff asked the night nurse, in the presence of the escorting officer, to have his heart medication filled, and was handed a form he was forbidden the means to complete. He reported the injuries and asked to be examined; he submitted a written request describing headaches and dizziness on standing; he told the nurses what he had been prescribed. The same jail had sent him to a hospital for blood tests over the hunger strike weeks earlier, and its own nurse had asked a court to release him on medical grounds; it knew how to obtain an examination when it chose to.

131. On or about December 19, 2024 a nurse handed the Plaintiff a sick call form through the portal in his cell door and would not fill it out for him, after he had asked her to have his

heart medication filled. The officer with her refused him a pen and told him he should not have been given the form at all. Both walked away laughing. The nurse could have taken down what he told her and held the form on the shelf below the portal for his signature. A jail that hands a man asking for his heart medication a medical form and then denies him the means to write on it has not given him access to care, and the refusal came from the officer rather than from anyone medical.

132. A corrections officer was present at every medical contact, and corrections officers screened written medical requests before medical staff saw them. The City put the judgment of guards between an inmate and a nurse.

133. A doctor with the Plaintiff's written report of headaches and dizziness in hand prescribed an over-the-counter pain reliever without seeing him. No one examined him, ordered imaging, or issued his medication. Had the doctor come up and personally examined the Plaintiff, he would have seen that the Plaintiff was on suicide watch with no pillow to rest his head on, and he could have ordered the guards to give him at least a pillow for his head. Even though the Plaintiff was on suicide watch, a doctor's order to give him a pillow would have overridden anything the jail had decided, because a doctor's orders take precedence. That is a legitimate thing that went wrong and that would have been different if the doctor had simply come up and examined him instead of sending a nurse with aspirin. That response was medically unacceptable under the circumstances and was chosen in conscious disregard of an excessive risk to his health. Estelle v. Gamble, 429 U.S. 97 (1976); Farmer v. Brennan, 511 U.S. 825 (1994); Toguchi v. Chung, 391 F.3d 1051, 1058 (9th Cir. 2004); Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996).

134. Nevada law placed the duty to arrange that care on the City. NRS 211.140(4) requires the chief of police to arrange for the administration of medical care required by prisoners while in his or her custody, and NRS 211.140(4)(a) makes the city responsible for the cost of treating

an injury a prisoner incurs while in custody.

135. The delay in care caused him further harm, including prolonged pain and a shoulder injury that remains untreated.

**COUNT SIX: Municipal Liability**

42 U.S.C. § 1983; Monell v. Department of Social Services, 436 U.S. 658 (1978)

**Against the CITY OF LAS VEGAS**

136. The Plaintiff incorporates every preceding paragraph.

137. The violations described in Counts One through Five were caused by the policies, customs and practices of the City of Las Vegas: a rule or practice barring an inmate from filing anything with a court during the first thirty days of custody; a rule or practice that an inmate may file a sentence modification or an appeal but not both; no grievance procedure and no staff-complaint process at the City jail; no system for delivering inmate court filings to a court; the practice of letting sergeants and other non-lawyer staff tell inmates what they may file; the practice of having corrections officers rather than medical staff screen medical requests and of stationing an officer at every medical contact; no process by which any use of force on an inmate could be reviewed on that inmate's complaint, because the facility had no staff-complaint process at all; a failure to train corrections officers on the use of force against a compliant prisoner already under the control of four officers; and the practice of removing clothing, mattress, blanket, shower access and any writing instrument from every inmate on suicide watch as a standing condition rather than an individual medical decision, including a management decision to stop issuing suicide blankets and the issuance of suicide gowns whose fastenings no longer hold.

138. The City is charged with knowledge of the standards the State Board of Health adopted for local jails under NRS 444.335. A standing condition that removes the mattress, the blanket and the clothing of every inmate placed on suicide watch, with no judgment about the individual inmate, cannot be squared with NAC 211.340(1). Seventeen days without a shower cannot be squared with NAC 211.540(4) or with NAC 211.350(4). The decision to stop issuing suicide blankets, described to the Plaintiff by one of the jail's own nurses, was made by management and not by the officer at his door.

139. A policy barring any filing for thirty days when the law allows ten days to appeal causes a denial of access to the courts by its own terms. No pattern is needed to hold the City liable for it.

140. In the alternative, these practices were so persistent and widespread as to be the City's custom, and the City failed to train its employees on inmate court access, on lawful suicide-watch conditions, and on the handling of medical requests, with deliberate indifference to the rights of the people in its custody. City of Canton v. Harris, 489 U.S. 378 (1989); Connick v. Thompson, 563 U.S. 51 (2011).

141. Those policies, customs and failures were the moving force behind the Plaintiff's injuries.

142. The documents that establish them, the inmate handbook, posted rules, classification post orders, and the suicide watch, inmate request, legal access, sick call and video retention policies in force from December 2024 through January 2025, are in the sole possession of the City. The Plaintiff requested them on September 8, 2026 and has not received them.

**COUNT SEVEN: Nevada State-Law Claims**

Battery, Negligence, and Intentional Infliction of Emotional Distress

**Against the CITY OF LAS VEGAS**

143. The Plaintiff incorporates every preceding paragraph.

144. Under NRS 41.031(1) the State of Nevada has waived the City of Las Vegas's immunity, and the City is liable for the torts of its employees committed within the course and scope of their employment, in the same manner as a private employer. Under NRS 41.745 the City is liable for an employee's intentional conduct unless the conduct was a truly independent venture, was not committed in the course of the task assigned, and was not reasonably foreseeable. A corrections officer's use of force on an inmate in his custody, and the withholding of clothing, bedding and medical care from that inmate, are within the task assigned and are foreseeable.

145. Battery. The City is liable for a battery committed by Defendant RODRIGUEZ and a second officer, who, acting within the scope of their employment, intentionally made harmful and offensive contact with the Plaintiff by pain compliance holds applied without cause and by driving his head into a concrete wall, without consent and without legal justification. The individual officers are not named in this Count, for the reason stated below.

146. Negligence. The City's employees owed the Plaintiff, a person in their custody, a duty of reasonable care for his safety, health, and access to the courts. NRS 211.140(4) and the standards adopted by the State Board of Health under NRS 444.335, set out in NAC Chapter 211, fix the minimum of that care. They breached that duty, and the breach caused his injuries.

147. Intentional infliction of emotional distress. Holding a fifty-nine-year-old man on a concrete floor under constant light for fifteen days with no clothing that would stay on, displaying him naked to officers of both sexes at every routine check and mocking him

through the cell window for the effect of the cold on his genitals, moving a screaming inmate across from him, handing him a medical form through the door and then refusing him a pen to write on it, cutting him off from his family, and refusing him the means to file an appeal is extreme and outrageous conduct. The City's employees intended to cause severe emotional distress or acted in reckless disregard of the probability of causing it, and the Plaintiff suffered severe emotional distress.

148. The Plaintiff reserves the right to add the individual Defendants to this Count by amendment once a claim has been filed against the City under NRS 41.036, as NRS 41.039 requires before a tort action may be filed against an employee of a political subdivision.

## VI. PREVIOUS LAWSUITS

149. The Plaintiff has not previously filed any lawsuit dealing with the facts alleged in this Complaint.

150. In or about September 2024 the Plaintiff submitted a complaint and an application to proceed in forma pauperis in this Court against Judge Bert Brown concerning the underlying municipal-court prosecution. A judge of this Court denied the application and the matter did not proceed. The Plaintiff does not have the case number, if one was assigned.

151. On August 20, 2024 the Plaintiff filed Steele v. Attorney General of Nevada, Case No. A-24-900152-C, in the Eighth Judicial District Court, Clark County, concerning the underlying prosecution. It does not concern the events at the City of Las Vegas Detention Center.

## VII. PRAYER FOR RELIEF

The Plaintiff asks that this Court:

152. Enter judgment for the Plaintiff on every count;

153. Award compensatory damages against all Defendants, jointly and severally, in an amount to be determined at trial, for physical injury, medical expenses incurred and to be incurred, pain and suffering, sleep deprivation, loss of family contact, mental anguish, and the loss of his right to appeal;

154. Award punitive damages on Counts One through Five against Defendants RODRIGUEZ, OFFICER COOK, SERGEANT COOK, and each Defendant JOHN DOE in an amount to be determined at trial, punitive damages not being available against the City of Las Vegas on any count and not being available on Count Seven under NRS 41.035(1);

155. Award the costs of this action;

156. Award compensatory damages against all Defendants, jointly and severally, in an amount to be determined at trial, for physical injury, medical expenses incurred and to be incurred, including the ambulance the jail required him to take on his release, the University Medical Center charges arising from that transport, and the magnetic resonance imaging of his right shoulder, pain and suffering, sleep deprivation, isolation from his family, mental anguish, and the loss of his right to appeal;

157. Grant any other relief the Court finds just.

## VIII. DEMAND FOR JURY TRIAL

The Plaintiff demands a jury trial on every claim and issue so triable. Fed. R. Civ. P. 38(b).

DATED this 22nd day of September, 2026.

ROBERT X. STEELE
2100 Lenwood Ave
North Las Vegas, NV 89030
(702) 416-4239
SuperGPatriot@tutamail.com
Plaintiff, in Proper Person

## VERIFICATION

I, Robert X. Steele, declare under penalty of perjury under the laws of the United States that I am the Plaintiff in this action, that I have read the foregoing Complaint, and that the statements of fact in it are true of my own knowledge, except those stated on information and belief, which I believe to be true.

Executed at North Las Vegas, Nevada, on September 22, 2026.

ROBERT X. STEELE